**BOARD OF TRUSTEES, CONTAINER MECHANICS WELFARE/PENSION FUND, Plaintiff-Counter-Defendant-Appellee,**

v.

**UNIVERSAL ENTERPRISES, INC., Defendant-Counter-Claimant-Appellant,**

E.A. Rabadue, Ed Money, Terry Thompson, and Chester Dunham, Counter-Defendants-Appellees.

No. 84–8004.

United States Court of Appeals, Eleventh Circuit.

Jan. 28, 1985.

William J. Rodgers, Stephen R. Mysliwiec, Washington, D.C., John Tatum, Savannah, Ga., for defendant-counter-claimant-appellant.

Robert W. Schivera, James M. Thompson, Savannah, Ga., for plaintiff-counter-defendant-appellee.

Andrew J. Hill, III, Savannah, Ga., for Rubadue, Money, Thompson, Dunham.

Before RONEY and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Suit was brought by the Board of Trustees ("Board") of the Container Mechanics Welfare/Pension Fund ("Container Fund" sometimes referred to as "Savannah Fund") under Section 502 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, and Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186, against Universal Enterprises, Inc. ("Universal") for pension and welfare contributions alleged to be owing under an industry-wide collective bargaining agreement. Universal answered the Board's complaint and asserted a counterclaim against the individual Trustees of the Container Fund ("Trustees") alleging breach of fiduciary duty as to a merger of the Container Fund with the International Longshoremen's Association ("ILA") Deep Sea Fund. Following a non-jury trial the district court for the Southern District of Georgia entered judgment in favor of the Board on its complaint and in favor of the Trustees on the counterclaim. Universal appeals.

## BACKGROUND

In 1977 the Savannah Container Maintenance Association, Inc. ("the Association"), representing certain employers of container mechanics, was formed to negotiate a multi-employer collective bargaining agreement with Local 1414 members under an agreement negotiated by the Savannah Maritime Association.

On June 14, 1978, an agreement ("1978 Contract") was executed between Local 1414 and the Association, to be effective from October 1, 1977, to September 30, 1980. Article IX of the 1978 Contract provided for the establishment of employee benefit trust funds. The Board was appointed pursuant to a trust agreement between Local 1414 and the Association, and the contributions were made payable to the Container Fund. Meanwhile, the shipping lines paid their contributions into the Deep Sea Fund.

Negotiations for a new agreement began in 1980 with Universal's president, Fred Otterbein, serving as chairman of the Association's negotiating committee. Although a new collective bargaining agreement had not been reached before the expiration of the 1978 Contract on September 30, 1980, the parties had agreed to new wage rates beginning at $11.60 per hour (an increase of $1.20 per hour) and total fringe benefit contribution rates of $4.535 per hour (an

increase of $.42 per hour) for the period October 1, 1980, through September 30, 1981.

These rates conformed with the rates established in the ILA's new collective bargaining agreement with the Savannah Maritime Association. The $4.535 was broken-down as follows: $2.50 for pension and $1.67 for health and welfare benefits. These ILA sums were paid into the Deep Sea Fund, which had assets totaling $25,-000,000. While this left only $.365 per hour for vacation and holiday benefits, these funds were administered in a "container royalty fund" or "Superfund," which was supplemented with royalties from the steamship lines based on tonnage assessments. Only Deep Sea Fund participants could participate in the Superfund.

The Association's negotiators understood that Local 1414 sought to provide in the new collective bargaining agreement that the Container Fund should be merged with the Deep Sea Fund. On October 14, 1980, the 1978 trust agreement was amended to establish an escrow fund into which all subsequent contributions were to be paid.

Beginning October 1, 1980, all members of the Association, including Universal, increased the wages paid to their employees according to the August 1980 agreement. Universal also began charging its customers the $4.535 to reflect the increase in fringe benefit rates that had been agreed upon, and it continued reporting hours worked by its container mechanics to the container fund. However, it ceased making contributions to the fund, a fact which it did not report to its employees, who were members of Local 1414.

Negotiations between Local 1414 and the Association for a new collective bargaining agreement continued. On May 15, 1981, the negotiators reached a tentative agreement, which provided for continuation of the Container Fund. However, on May 19, 1981, at a meeting in Charleston, South Carolina, attended by national and local ILA officials and representatives of the shipping lines, Local 1414 agreed to negotiate for the Association's adherence to a uniform ILA collective bargaining agreement called the "Charleston agreement," covering all ILA members in South Atlantic ports. This agreement contemplated the merger of local pension and welfare trust funds with the Deep Sea Fund and the Superfund.

On May 20 or 21, 1981, Local 1414 presented this proposal to the Association. A majority of the members, desiring to maintain their relations with the shipping lines, agreed to accept the Charleston agreement instead of the agreement negotiated on May 15. Otterbein, however, objected and withdrew Universal from the Association.

The Association and Local 1414 executed the "Charleston agreement" on May 22. At the same time they executed a "memorandum of agreement" whereby they agreed to pursue the merger of the Container Fund with the Deep Sea Fund and the Superfund. These funds were to be merged, subject to final approval and implementation by the Trustees of the various funds. Moreover, pension and welfare contributions were committed to the Deep Sea Fund effective October 1, 1980.

Immediately following Universal's withdrawal from the Association, its pier operations were taken over by its wholly-owned subsidiary, Marine Transport Services ("MTS"). On May 28, 1981, MTS joined the Association and agreed to be bound by the 1981 contract.

MTS had been incorporated in Delaware in April 1981 and was capitalized by Universal with $100. Otterbein, owning 73% of Universal's stock, and his wife were the sole directors of Universal; Otterbein was its president and treasurer. He was also the sole director of MTS. William Brasili was named president of MTS. Moreover, the vice president and secretary of MTS, Clayton Woody, was Universal's comptroller, and its work foreman, Ted Venable, was also a vice president and office manager for Universal. MTS used Universal's bookkeeping and accounting offices, which were under Moody's supervision. MTS used Universal trucks, vehicles and office

equipment without paying rent to Universal. By July 31, 1981, MTS was indebted to Universal for $115,205, for which no notes of indebtedness existed. Moreover, MTS's bills were paid by Universal. In the meantime, no MTS directors meeting had been held authorizing the borrowing of funds from Universal or electing officers.

MTS took over Universal's on-pier operations and all of its employees who belonged to Local 1414. Universal continued to provide off-pier services to customers who had no relationship with the ILA. Universal's remaining employees were non-union for some time thereafter.

Meanwhile, preparations were made to effectuate the merger of the Container Fund with the Deep Sea Fund by October 1, 1981, as contemplated by the 1981 Contract. On that date, the Container Fund had assets totaling $924,701. Of this, pension and welfare contributions paid under the 1981 Contract accounted for $591,472. In addition, $136,486 was committed to the payment of accrued vacation and holiday benefits under the old contract. Thus, pension and welfare funds built up under the 1978 Contract totalled $196,743.

The Deep Sea Fund demanded that all assets less expenses of the Container Fund be turned over to the Deep Sea Fund regardless of whether those assets represented hours worked before or after October 1, 1980. The Container Fund's attorney requested a more detailed explanation and justification for this position. The Container Fund Trustees considered various options for disposing of these funds, made inquiries about the management, size, financial health, history, etc. of the Deep Sea Fund, and conferred with Container mechanics to ascertain what rights and benefits the mechanics desired under the proposed merger. They also inquired how employers participating under the Deep Sea Fund felt about their relationship with the Fund. The unfunded liability of the Deep Sea Fund was discussed with its trustees. The Container Trustees considered whether it would be better for their mechanics to simply divide up the pre-October 1, 1980

Container Fund assets into cash payments for their few years of service or whether it was better for their beneficiaries for the Container Trustees to try and gain service credit toward pension vesting under the Deep Sea Fund for the mechanics. The Container Fund also discussed seeking for their beneficiaries under any merged fund cross-over capabilities so that a Container mechanic could work both as a mechanic and a deep sea laborer and accumulate time toward his annual 400-hour minimum required for pension eligibility and 700-hour minimum per year for welfare eligibility. Credit for years of service for Container royalty benefits was also sought by the Trustees back to 1975 and credit for years of service to obtain accrued pension benefits for the Container mechanics was sought from the effective date of the Container Fund, 1977. A survey of the mechanic employees by the Trustees revealed that these employees desired the merger and wished to obtain past service credit for years worked under the Container Fund as to pension and as to participating in Container royalty.

The Container Trustees were also aware that the Deep Sea Fund had far greater assets ($25,000,000) and had been in existence much longer. A comparison of the welfare benefits provided by the two plans revealed that the Deep Sea Fund provided retirement, benefits of $725.00 instead of the $550.00 per month, better life insurance, better accident and sickness benefits, better vision/lens/contact provisions, and better dental/orthodontic provisions.

The Trustees of the Container Fund met with the Trustees of the Deep Sea Fund and the Superfund on August 13, 1981. An actuarial presentation was made by Johnson & Higgins, actuaries of the Deep Sea Fund, which demonstrated to all parties concerned what the effects of the merger would be on each group's beneficiaries. The actuaries cautioned that they were acting on behalf of the Deep Sea Fund and could not render an opinion whether the merger was in the best interest of the beneficiaries under the Container Fund.

However, the minutes of the meeting reflect the actuary's opinion that as a result of the merger "participants of both groups should be benefited."

Immediately following the joint meeting, the Container Fund Trustees met for the sole purpose of considering the merger and terms under which it should be consummated. The four Trustees adopted resolutions approving the merger and the transfer of pension and welfare funds collected for hours prior to and subsequent to October 1, 1980, into the Deep Sea Fund.

On July 21, 1981, the Board of Trustees filed the present action against Universal for fringe benefit contributions covering the Local 1414 members who were employed in Universal's on-pier operations from October 1, 1980, to May 31, 1981.

In a related action, Local 1414 brought an unfair labor practice charge against Universal on September 28, 1981. The charge by Local 1414 and the general counsel's complaint asserted that Universal had committed an unfair labor practice by withdrawing from the Association, refusing to sign the 1981 Contract and subsequently having its alter ego (MTS) sign it. The administrative law judge held that Universal was not bound by the 1981 Contract, noting that insufficient evidence was offered with regard to MTS's operations in the unfair labor practice hearing to enable him to reach a conclusion as to whether or not MTS was an alter ego of Universal.

In April 1982, Universal amended its answer to the Board's complaint to assert a counterclaim against the individual Trustees alleging that their actions in approving the merger of the Container Fund with the Deep Sea Fund constituted a breach of their fiduciary duty.

Following a bench trial, the district court found that Universal was liable for fringe benefit contributions for the period October 1, 1980, through May 31, 1981. This was based on the court's finding that MTS was the alter ego of Universal. The court rejected Universal's claim that the decision of the administrative law judge in the NLRB unfair labor practice proceeding was res judicata on the issue of whether MTS was Universal's alter ego. The district court also found that the Trustees of the Container Fund had breached no fiduciary duty in approving of the terms and conditions of the merger with the Deep Sea Fund on August 13, 1981.

## ISSUES

1. Whether the decision of the administrative law judge in the unfair labor practice proceeding brought by Local 1414 against Universal precluded the district court from adjudicating MTS's status as Universal's alter ego in this suit;

2. Whether the alter ego claim is subject to the primary jurisdiction of the National Labor Relations Board;

3. Whether the district court's conclusion that MTS was the alter ego of Universal is clearly erroneous;

4. Whether the alleged commingling of pension fund contributions with other fringe benefit contributions excused Universal's non-payment of contributions;

5. Whether the district court erred in concluding that the Trustees had not breached their fiduciary duty when they agreed to transfer all of the Container Funds assets to the Deep Sea Fund;

6. Whether the district court abused its discretion in refusing to allow Universal's expert witness to testify concerning the effect of the merger on the Container Fund.

## DISCUSSION

### A. Standard of Review of the Parties

The parties are in agreement that Issues 1, 2 and 4 are questions of law which are freely reviewable; that Issues 3 and 5 involve findings of fact which are subject to the clearly erroneous standards; and that Issue 6 requires the Court to ascertain whether the district court abused its discretion.

## B. The Preclusive Effect of the NLRB Proceeding

As noted above, at the same time that the Board of Trustees of the Container Fund was bringing suit under ERISA to recover delinquent fringe benefit contributions from Universal, Local 1414 was bringing an unfair labor practice charge against Universal for its withdrawal from the Association, its refusal to sign the 1981 Contract and its unilateral termination of contributions to the Container Fund upon the expiration of the 1978 Contract. The general counsel brought a complaint on the basis of Local 1414's charge, which was heard by an administrative law judge. Although the ALJ found that Universal had committed an unfair labor practice in terminating the contributions, he did not find that Universal was bound by the 1981 Contract.

■■■ Universal's assertion that the ALJ by implication found that MTS was not the alter ego of Universal is incorrect. It appears that the ALJ simply concluded that there was not enough evidence for him to find Universal bound to the 1981 Contract on an alter ego theory. In any event, the Board and the Trustees correctly point out that principles of res judicata apply only to subsequent actions between the parties to an original action and those in privity with them. *See Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981); 1B J. Moore, *Federal Practice,* § 0.405[1], at 181 (2d ed. 1984). It is certainly true that, where the parties to administrative proceedings which are judicial in nature have an adequate opportunity to litigate disputed issues of fact, courts will apply res judicata effect to such proceedings. *See United States v. Utah Construction and Mining Co.,* 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642 (1966).

■■■ The problem with Universal's claim of res judicata is that in this suit Universal is opposed, not by Local 1414 and the general counsel, but by the Board of Trustees of the Container Fund and the individual trustees. It cannot be said that those parties have such an identity of interest with Local 1414 as to be deemed in privity with the Union for purposes of res judicata. Neither the Board nor the Trustees had standing to bring an unfair labor practice charge against Universal. Moreover, the Trustees included representatives of both labor and management, whose interests in protecting the funds were different in many respects from Local 1414's interests in preserving its bargaining rights under the NLRA. Thus, we conclude that principles of res judicata do not apply to preclude the district court's consideration of whether MTS was the alter ego of Universal on the basis of the unfair labor practice decision.

## C. Primary Jurisdiction

■■■ As a general rule, courts must yield to the primary jurisdiction of the NLRB in adjudicating activity which is either arguably protected by Section 7 or arguably prohibited by Section 8 of the LMRA, 29 U.S.C. §§ 157, 158. *See San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244–45, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959). It is equally well-established that this doctrine does not apply to destroy the jurisdiction of the courts in suits brought under Section 301 even when the activity in question is either arguably protected by Section 7 or arguably prohibited by Section 8. *William E. Arnold Co. v. Carpenters,* 417 U.S. 12, 14, 94 S.Ct. 2069, 2071, 40 L.Ed.2d 620 (1974); *Smith v. Evening News Association,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Thus, pursuant to Section 301, federal courts have independent jurisdiction to decide cases alleging breaches of collective bargaining agreements, even though a breach may also constitute an unfair labor practice. *Carpenter's Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d 489 (5th Cir.1982).

■■■ While Universal concedes that the construction and enforcement of collective bargaining agreements is ordinarily a prov-

ince of the courts under Section 301 rather than the NLRB, it insists that the existence of a collective bargaining agreement in the first place is a matter of primary NLRB jurisdiction. It is certainly true that oftentimes the existence of a collective bargaining agreement depends on the existence of an appropriate bargaining unit, which only the NLRB may determine. *See South Prairie Construction Co. v. Local 627, International Union of Operating Engineers,* 425 U.S. 800, 805–06, 96 S.Ct. 1842, 1844–45, 48 L.Ed.2d 382 (1976). However, where a question of unit determination is not presented, a court may properly ascertain who is bound by a particular collective bargaining agreement and in doing so may ascertain whether two employers in fact constitute a single employer. *Id.* The same reasoning applies to an alter ego situation, as is presented here. There is no question that the on-pier Container mechanics employed by Universal prior to its withdrawal from the Association constituted an appropriate bargaining unit. There is also no question that those same employees constituted the bargaining unit covered by the MTS agreement. Thus, the only question for determination by the court is whether the employees in that bargaining unit were covered by a collective bargaining agreement during the period October 1, 1980 through May 31, 1981. This is not a question which ordinarily requires Board determination. Instead, the question whether MTS was merely the alter ego of Universal depends for its resolution on basic principles of corporation law, and the question whether a contract was in existence is purely a matter of contract law. It is the law in this Circuit that a district court has jurisdiction under Section 301 to make a determination as to whether a collective bargaining agreement in fact exists. *United Steel Workers of America v. Rome Industries, Inc.,* 437 F.2d 881 (5th Cir. 1970). Thus, we conclude that there is no reason to decide that this suit should be preempted by the primary jurisdiction of the NLRB.

### D. *MTS as the Alter Ego of Universal*

■ The Supreme Court has held that an alter ego situation involves "a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management." *Howard Johnson Co. v. Hotel and Restaurant Employees,* 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 2242 n. 5, 41 L.Ed.2d 46 (1974). In deciding whether one company is an alter ego of another company, the NLRB will often look to the following factors: whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership. *Pratt-Farnsworth,* 690 F.2d at 507.

■ There is no question that the district court's conclusion that MTS was in fact the alter ego of Universal, functioning as a disguised continuance of Universal to enable Universal to avoid any liability under the 1981 Contract, is supported by substantial if not overwhelming evidence. Since, therefore, Universal effectively voluntarily signed the 1981 Contract, through its alter ego, it was bound by the retroactive fringe benefit provisions therein, and was thus accountable to the Board of Trustees of the Container Fund for contributions from October 1, 1980, to May 31, 1981.

### E. *Commingling of Benefit Funds in the Escrow Fund*

Universal contends that it should be excused from any obligation to pay fringe benefit contributions for the period October 1, 1980 through May 31, 1981 because all of the fringe benefit contributions made by the Association members after October 1, 1980 were commingled in an escrow fund in violation of Section 302(c)(5)(C) of the LMRA, which provides:

[S]uch payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be

used for any purpose other than paying such pensions or annuities; ...

29 U.S.C. § 186(c)(5)(C).

██ It is true that, where a collective bargaining agreement anticipates the creation of a health and welfare fund in which pension contributions are to be commingled with other benefit contributions in violation of Section 302(c)(5)(C), an employer may be excused from his obligation under the agreement to pay into the noncomplying fund. *Bricklayers International Union of America, Local Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1029 (5th Cir.1975). However, it has also been held that technical noncompliance with other restrictions on employee benefit trust funds contained in Section 302(c)(5) does not necessarily excuse an employer from its contractual obligations to pay into a fund, where the "structural defect" does not practically preclude further contributions. *See, e.g., Central Florida Sheet Metal v. NLRB*, 664 F.2d 489, 498 (5th Cir. Unit B, 1981); *National Stabilization Agreement Trust Fund v. Commercial Roofing and Sheet Metal*, 655 F.2d 1218, 1227 (D.C.Cir. 1981).

██ The district court rejected Universal's Section 302(c)(5)(C) defense on the ground that no abuse of discretion was shown and that in fact under the circumstances the temporary comingling of contributions in the escrow fund pending the execution of a new contract was reasonable, if not necessary.

At the time the escrow fund was established, the parties had agreed simply to a total hourly fringe benefit rate of $4.535, though it was understood that specific fund allocations would be made in the collective bargaining agreement. It was also clear that the $4.535 was based on the rate established in the agreement with the shipping lines, which did specify allocations. However, the small amount represented by vacation and holiday contributions under that agreement was to be supplemented by Container royalty payments into the Superfund, which would not have been available under the Container Fund. Thus, under

the circumstances, we conclude that the district court was correct in holding that the establishment of the escrow fund, though perhaps technically in violation of Section 302(c)(5)(C), did not excuse Universal's obligation to continue paying into the Container Fund.

### F. *The Trustees' Fiduciary Obligation as to the Merger with the Deep Sea Fund*

██ The district court found that the Trustees had not breached their fiduciary duty to the beneficiaries of the Container Fund when they approved the terms and conditions of the merger into the Deep Sea Fund. The trial court based this finding on its determination that:

Prior to approving the merger of the Funds, the Trustees of the Savannah Fund determined that it would be in the best interests of the participants and beneficiaries of the Savannah Fund. Before reaching this conclusion, the Trustees conferred with container mechanics covered under each fund, trustees of the Deep Sea Fund and participating employers of the Deep Sea Fund and determined that (1) the container mechanics had consistently expressed their interest in becoming covered by the Deep Sea Fund; (2) the beneficiaries desired to maintain credit for past years of service in order to have an earlier vested interest in the pension fund; (3) the beneficiaries wanted to take advantage of the cross-over benefits which permitted employees to accumulate hours worked as mechanics as well as longshoremen to reach the 700 hours per year required for pension eligibility and 400 per year for welfare benefits; and (4) the beneficiaries desired to participate in Annual Container Royalty payments which are available to beneficiaries of the Deep Sea Fund. In addition, the Trustees were aware that the Deep Sea Fund had far greater assets and had been in existence much longer than the Savannah Fund. The only evidence of any detrimental effect of the merger on the beneficiaries was the possible loss of

some vacation benefits, which were to be provided by the district fund in Jacksonville subsequent to the merger. The Trustees concluded that the benefits of the merger clearly outweighed this possible loss.

Accrued benefits after the merger were no less for Savannah Fund beneficiaries than before the merger. MacPhee certified to the Pension Benefit Guaranty Corporation that no successor plan participants would have less accrued benefits after the merger than before, and the container mechanics were included in that class.

In pursuing the merger, the Trustees of the Savannah Fund acted under directions by the parties to the 1981 Contract, Local 1414 and the Association. Before approving the merger, the Trustees evaluated the effects of the merger on the participants and beneficiaries of the Savannah Fund.

Universal, however, says these findings are not enough, pointing to paragraph 7.1 of the agreement setting up the Trust. This paragraph provides that no consolidation or merger in another plan may be effected unless

each Employee in the Plan would (if the plan then terminated) to the extent determined by the Pension Benefit Guarantee Corporation, receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit the Employee would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).

Universal contends that the Trustees made no such determination.

The difficulty with this argument is that it was not presented as an issue to the trial court under either the pleadings, pretrial order, outlining appellant's contentions, or in its proposed findings of fact, filed before the trial.

The complaint based its claim that the Trustees had violated their fiduciary obligations on the following allegation:

... Trustees individually owed certain fiduciary obligations, responsibilities and duties, including those responsibilities and duties imposed by 29 U.S.C. § 186, the Employees' Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. and the statutory and common law of the State of Georgia.

(2) The Trustees have breached and did breach their fiduciary obligations by consenting to the merger of the Container Mechanics Welfare/Pension Fund with another welfare and pension fund known as the Deep Sea Fund, with full knowledge or reckless and negligent disregard on the part of the Trustees that after said merger the benefits provided to the beneficiaries of the said Container Mechanics Welfare/Pension Fund would be diminished and that said beneficiaries would be less well off immediately after such merger than immediately prior thereto.

As will be seen, no mention is made of a contract provision carrying more stringent limitations with respect to the merging of such funds than those of the statutes.

In the pretrial stipulation, the defendant's counterclaim is stated in the following terms:

(a) In its counterclaim, Defendant asserts that the Trustees breached their fiduciary obligation by agreeing to merge the Container Mechanics Welfare/Pension Fund with the "Deep Sea" Fund, because the merger resulted in a reduction of benefits to the beneficiaries of the former Container Mechanics Welfare/Pension Fund. *Defendant's claims are premised on the statutory and common law of the State of Georgia, and on the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq* (emphasis added.).

(b) Defendant asserts, in the alternative, that the Trustees were negligent in not assuring that the interests of the Fund's beneficiaries would not be harmed by the merger with the "Deep Sea" Fund.

(c) Defendant asserts that the following statutes were violated:

Ga.Code Ann. § 108–402:

Trustees having possession of the trust property are bound to ordinary diligence in the preservation and protection of the same.

Ga.Code Ann. § 108–423:

All persons aiding and assisting trustees of any character, with a knowledge of their misconduct, in misapplying assets, are directly accountable to the persons injured.

Ga.Code Ann. § 108–429:

The Trustee shall not use the trust funds to his own profit. He shall be liable to account for all such profits made.

29 U.S.C. § 1411:

(a) Unless otherwise provided in regulations prescribed by the corporation, a plan sponsor may not cause a multiemployer plan to merge with one or more multiemployer plans, or engage in a transfer of assets and liabilities to or from another multiemployer plan, unless such merger or transfer satisfies the requirements of subsection (b) of this section.

(b) A merger or transfer satisfies the requirements of this section if—

. . .

(2) no participant's or beneficiary's accrued benefit will be lower immediately after the effective date of the merger or transfer than the benefit immediately before that date.

Thus, it is seen that there is still no mention of a violation of paragraph 7.1 or any other term, for that matter, of the Contract.

Finally, in response to the court's request to the parties to file proposed findings of fact and conclusions of law just before the trial, the appellants filed their proposed findings of fact and conclusions of law, which still made no reference to this provision in the Contract. Instead, it tracked the language of the complaint by stating:

In effectuating the merger of the Savannah Fund with the Deep Sea Fund, the counter-defendants breached their fiduciary duties under Section 404(a)(1) of the Employee Retirement Income Security Act, 29 U.S.C. § 1104(a)(1); Section 302(c)(5) of the Labor Management Relations Act of 1947; 29 U.S.C. § 186(c)(5); Ga.Code Ann. §§ 101–402, 101–423 and 101–429 [§§ 108–402, 108–423, 108–429]; and the common law of the State of Georgia *regarding the fiduciary duties of Trustees.* [Emphasis added.]

In light of the foregoing, it is no surprise to learn that, as stated by appellants "the district court did not make any findings of fact or conclusions of law concerning this [paragraph 7.1] test or whether the counter-defendants complied with it." The court made no such findings, because no such issue was presented to the court under the pleadings or the pretrial order.

Even though these issues could be held to have been properly presented to the trial court, we conclude that the trial court did not err in finding a failure of the counter-claimant to prove a violation of their duties by the Trustees. Universal contends that the provisions of 7.1 require the Trustees to determine in advance of any merger whether an immediate termination, before a merger, would produce more in value to the beneficiaries of a trust than they would enjoy immediately following such a merger. The trial court concluded that not only did the Trustee's action meet the standards required by law, but also: "It was their determination that the merger was in the best interest of the participants, and the beneficiaries of the Savannah Fund...."

This conclusion was based upon the findings of fact made by the trial court, as outlined above at p. ——. These findings may be equated with the test of paragraph 7.1 of the Contract, since it states that the Trustees fully considered the benefits that might result from a termination resulting from a merger. We find no error in the trial court's finding that there was no violation by the Trustees of their duties under the Trust.

### G. *Remaining Issues on Appeal*

We find no merit in appellant's claim of error by the trial court in refusing to permit Universal's actuarial expert to testify. Although the Board requested the name of any witnesses early in the discovery proceedings, Universal gave no indication of their intention to engage the witness Poulin until two weeks before trial. Clearly, it was within the trial court's discretion to decide that this was too short a time to permit the plaintiffs to depose such prospective witness and seek to respond to his proposed testimony. We find no abuse of its discretion.

Finally, we conclude that there is no merit to the appellant's complaint that the trial judge, Judge Edenfield of the Southern District of Georgia, refused to recuse himself because one of the lawyers for the Trustees in this action was representing his former law firm of which the judge's brother was still a partner.

The judgments are AFFIRMED.