737 F.2d 1501
 116 L.R.R.M. (BNA) 3357, 101 Lab.Cas. P 11,132,
5 Employee Benefits Ca 1908
 OPERATING ENGINEERS PENSION TRUST, Operating Engineers
Health and Welfare Fund, Operating Engineers
Vacation-Holiday Savings Trust and
Operating Engineers Training
Trust, Plaintiffs-Appellants,
v.
Bill W. GILLIAM, individually and doing business as Valco
Construction Co., Inc., Defendant-Appellee.
 Nos. 83-5929, 83-6367.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1984.
Decided July 19, 1984.
 
 Wayne Jett, Jett, Clifford & Laquer, Los Angeles, Cal., for plaintiffs-appellants.
 Robert F. Walker, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before GOODWIN, SNEED, and ALARCON, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 Appellant Trust Funds brought suit against Bill W. Gilliam pursuant to section 301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. Sec. 185(a), and section 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sec. 1132. Gilliam, the Trust Funds alleged, owed more than $365,000 in fringe benefit contributions required under a collective bargaining agreement. After hearing evidence, the district court ruled that no valid collective bargaining agreement ever existed and Gilliam therefore was not obligated to make benefit contributions. The district court awarded Gilliam attorney's fees pursuant to ERISA section 502(g)(1), 29 U.S.C. Sec. 1132(g)(1). We affirm.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 The facts of this case are unusual. The following summary is based on the district court's findings. We accept them because they are not clearly erroneous. See Bohemia, Inc. v. Home Insurance Co., 725 F.2d 506, 508-09 (9th Cir.1984); Fed.R.Civ.P. 52(a).
 
 
 3
 In 1965, Gilliam obtained a contractor's license for excavation work from the State of California and began doing business under the name Valco Construction Company. Gilliam rented or borrowed construction equipment from another employer until 1969. In that year he bought a dump truck and a loader. He used this equipment to operate a gravel pit, and he also performed grading and demolition work. Between 1971 and 1977, Gilliam obtained contracts to operate landfills in Shafter, Boron, and Bakersfield in California. Each landfill contract required the operation of bulldozers and scrapers to cover and compact refuse. Gilliam acquired additional construction equipment, and by 1977 he had six employees working at the three landfills. He also continued to perform occasional grading and demolition work.
 
 
 4
 Griffith Construction Company (Griffith), a general contractor, contacted Gilliam in May 1977 and asked to rent a bulldozer and operator to use on a particular project. Gilliam explained that he was "non-union," and Griffith replied that the operator had to be a union member. Gilliam arranged for Griffith to put its own operator on the bulldozer for a few days, but indicated he would join the union as an owner-operator.
 
 
 5
 On May 27, 1977, Gilliam went to the district office of the International Union of Operating Engineers, Local Union No. 12 (union). He met with the union's business agent, Merle Watson, and told him that he wanted to become a union member as an owner-operator so that he could operate his bulldozer on the Griffith job. Watson told Gilliam that he would have to pay the union's membership fee and supply proof of ownership for the bulldozer and that the only benefit he would receive from his dues would be a burial fee. Watson asked what kind of equipment Gilliam had, and Gilliam answered that he had a "C-6 Dozer." When Watson asked if Gilliam had any other equipment, Gilliam replied, "No, just the one machine is what I'm going to run."
 
 
 6
 Watson produced various documents that he said were the standard forms signed by owner-operators. Watson filled out these forms based on information supplied by Gilliam, who then signed the forms at places indicated by Watson. Gilliam did not read the documents and, relying on Watson's representations, thought that he was applying to become a member of the union as an owner-operator.
 
 
 7
 The documents that Gilliam signed included a short-form bargaining agreement and a written acknowledgment of trust agreements incorporated by the short-form agreement. Watson did not inform Gilliam that he had signed a collective bargaining agreement or that the documents were applicable to any employee or operation other than Gilliam's use of the bulldozer. Watson gave Gilliam copies of the trust agreements, but no copies of the short-form agreement or the union's master labor agreement. After signing the documents, Gilliam paid approximately $120.00 as partial payment of his membership fees, and obtained a referral slip from the union for the Griffith job. The union immediately sent the Trust Funds a written notice stating that Gilliam was self-employed and should not be sent trust fund contribution forms.
 
 
 8
 Gilliam worked on the Griffith job for one day. He did not continue on this job because it interfered with his normal business. Except for the $120 paid to the union on May 27, 1977, Gilliam made no payments to the union or the Trust Funds. He did not submit proof of ownership of his bulldozer and did not become a union member. Gilliam has never operated Valco Construction Company as a union business, nor has he employed any union members. None of Gilliam's employees sought benefits from the Trust Funds.
 
 
 9
 Gilliam had no contact with the Trust Funds until more than four years after he sought to become a member of the union as an owner-operator. In August 1981, the Trust Funds contacted Gilliam and claimed he owed more than $365,000 in fringe benefit contributions. Gilliam refused to pay, and the Trust Funds brought suit under LMRA section 301 and ERISA section 502. After hearing evidence, the district court entered judgment in favor of Gilliam and awarded him attorney's fees. The Trust Funds filed a timely appeal.
 
 II.
 THE CONTRACT FORMATION ISSUE
 
 10
 Gilliam is obligated to make benefit contributions to the Trust Funds only if he was party to a binding labor agreement with the union. See, e.g., Carpenters Southern California Administrative Corp. v. Russell, 726 F.2d 1410, 1413 (9th Cir.1984). The position of the Trust Funds on this issue is straightforward: Gilliam signed the short-form agreement and that document is the best evidence of the existence of a labor contract; a court should not consider extrinsic evidence relating to the intent of the parties or the circumstances in which the signature was obtained.
 
 
 11
 Obligations under a collective bargaining agreement, like those under contracts in general, rest ultimately on the principle of mutual assent, however. See H.K. Porter Co. v. NLRB, 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970) (freedom of contract is a fundamental policy of federal labor law). Although the National Labor Relations Act allows each side to rely on certain economic pressures in the bargaining process, any collective agreement that emerges is the result of mutual assent and not legal compulsion. See id. at 103-04, 108, 90 S.Ct. at 823, 826; Summers, Collective Agreements and the Law of Contracts, 78 Yale L.J. 525, 531-32 (1969). Thus, the surrounding circumstances and the intentions of the parties are relevant to determining if a binding agreement exists. See United Steelworkers v. Bell Foundry, 626 F.2d 139, 141 (9th Cir.1980) (contract came into existence when parties came to "meeting of the minds" on operative terms); Lozano Enterprises v. NLRB, 327 F.2d 814, 819 (9th Cir.1964) (nondelivery of signed contract did not prevent formation of binding agreement where terms were in fact acceptable to employer); see also Genesco, Inc. v. Joint Council 13, United Shoe Workers, 341 F.2d 482, 486-89 (2d Cir.1965) (union not bound by contract which it would not be considered to have made on ordinary principles of contract law); United Steelworkers v. Rome Industries, 321 F.Supp. 1170, 1174 (N.D.Ga.) (intent of parties determines if parties reached collective bargaining agreement), aff'd in relevant part, 437 F.2d 881 (5th Cir.1970). Under the circumstances of this case, the fact that Gilliam signed the short-form agreement does not resolve the contract formation issue.[1]
 
 
 12
 We recognize that a party who signs a written agreement generally is bound by its terms, even though he neither reads it nor considers the legal consequences of signing it. See, e.g., Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 20 Cal.App.3d 668, 671, 97 Cal.Rptr. 811, 813 (1971); Restatement (Second) of Contracts Sec. 23, comments b, e (1981); E. Farnsworth, Contracts 116 (1982). This proposition, however, is qualified by the principle that he who signs a document reasonably believing it is something quite different than it is cannot be bound to the terms of the document. See Chandler v. Aero Mayflower Transit Co., 374 F.2d 129, 136 (4th Cir.1967); Reid v. Landon, 166 Cal.App.2d 476, 333 P.2d 432 (1958); J. Calamari & J. Perillo, Contracts 332 (2d ed. 1977); 1 Williston on Contracts Sec. 95A (3d ed. 1957). For example, one who signs a promissory note reasonably believing he only gave his autograph is not liable on the note.
 
 
 13
 Gilliam here told the union representative that he wished to become a member of the union as an owner-operator in order to work on the Griffith job. The union's agent, Watson, produced a number of standard forms that he said were signed by owner-operators. Watson did not tell Gilliam that any of the forms involved a short-form agreement. The union's agent filled out the forms based on information supplied by Gilliam, who then signed or initialed the documents at places indicated by Watson. Gilliam did not read the documents, but instead relied on Watson's representations that the forms were those signed by owner-operators. Gilliam did not at the time receive copies of either the short-form agreement or the union's master labor agreement.[2] Under the circumstances, Gilliam reasonably and justifiably thought the documents involved only an application for union membership and his signing of the short-term agreement did not create a binding collective bargaining agreement.
 
 
 14
 The Trust Funds argue that section 302 of LMRA, 29 U.S.C. Sec. 186, supports their position. We disagree. It is true that section 302 does not permit an employer to rely on an alleged oral modification of the terms of a written agreement to make benefit contributions. See, e.g., Maxwell v. Lucky Construction Co., 710 F.2d 1395, 1398 (9th Cir.1983); Kemmis v. McGoldrick, 706 F.2d 993, 996-97 (9th Cir.1983); Waggoner v. Dallaire, 649 F.2d 1362, 1366 (9th Cir.1981); see also Mo-Kan Teamsters Pension Fund v. Creason, 716 F.2d 772, 777 (10th Cir.1983) (following Dallaire ), cert. denied, --- U.S. ----, 104 S.Ct. 716, 79 L.Ed.2d 178 (1984). In each of these cases the employer recognized that he had entered into a collective bargaining agreement. Cf. Dallaire, 649 F.2d at 1367 (bargaining agreement not unenforceable adhesion contract where employer recognized master labor agreement and short-form agreement obligated him to make trust contributions). They do not present the issue involved here. Similarly, the Trust Fund's reliance on Southern California Retail Clerks Union v. Bjorklund, 728 F.2d 1262 (9th Cir.1984), is misplaced. Bjorklund held that an employer may not defend a suit to recover benefit contributions by claiming that his promise to make the contributions was fraudulently induced. Id. at 1266. There was no issue in Bjorklund whether the parties intended to enter into a collective bargaining agreement.
 
 
 15
 Nor does the purpose of section 302 support the Trust Funds. Congress enacted this section because of concerns about union corruption and alleged "shake-down" and "kick-back" schemes involving union welfare funds. See Dallaire, 649 F.2d at 1366. To eliminate a source of corruption, section 302 prohibits payments by employers to union representatives. Section 302(c)(5) provides an exemption for contributions to trust funds and requires that provisions for such payments be specified in a written agreement with the employer. 29 U.S.C. Sec. 186(c)(5)(B). In Dallaire we recognized that allowing oral agreements to modify the written provisions for benefit contributions would erode the protections afforded by section 302. 649 F.2d at 1366. Our holding in this case, however, will not erode this protection. A claim that an employer is not obligated to make any contributions because no collective bargaining agreement exists poses no danger of the employer tampering with the loyalty of union officials or of union officials exerting tribute from the employer. This is even clearer where an employer has never operated as a union company. Moreover, in this case no potential trust beneficiary can be injured or misled by the employer's claim that he never intended to enter a collective bargaining agreement.
 
 
 16
 We affirm the district court's conclusion that Gilliam was not obligated to make benefit contributions to the Trust Funds.
 
 III.
 THE AWARD OF ATTORNEY'S FEES
 
 17
 Section 502(g)(1) of ERISA, 29 U.S.C. Sec. 1132(g)(1), gives district courts discretion to award attorney's fees to employers that successfully defend actions brought under ERISA section 515, 29 U.S.C. Sec. 1145. See Russell, 726 F.2d at 1415; Sapper v. Lenco Blade, Inc., 704 F.2d 1069, 1073 (9th Cir.1983). In Russell, we expressly rejected the Trust Funds' contention that the statute does not allow fee awards to defendant employers, and we need not address those arguments again here.
 
 
 18
 Russell held that the criteria described in Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir.1980), should guide a court in determining whether to award fees to either plaintiffs or defendants under section 502(g)(1). 726 F.2d at 1416. Moreover, we noted that for the reasons expressed in Marquardt v. North American Car Corp., 652 F.2d 715 (7th Cir.1981), the Hummell factors very frequently suggest that attorney's fees should not be charged against ERISA plaintiffs. Russell, 726 F.2d at 1416.
 
 
 19
 In this case, the district court, while noting its hesitancy to award fees against the Trust Funds, applied the Hummell factors and concluded that the prosecution of this suit was grossly unfair, that the Trust Funds had substantial ability to satisfy the fee award, that the assessment of fees would deter unfair acts, and that the position taken by the Trust Funds was without merit. These findings are not clearly erroneous, and the district court did not abuse its discretion in awarding fees to Gilliam.[3] Gilliam is also entitled to reasonable attorney's fees incurred in this appeal. See id. at 1417.
 
 
 20
 AFFIRMED.
 
 
 
 [1]
 Our conclusion comports with the Supreme Court's decision in Jim McNeff, Inc. v. Todd, --- U.S. ----, 103 S.Ct. 1753, 1759, 75 L.Ed.2d 830 (1983). Section 8(f) of the National Labor Relations Act, 29 U.S.C. Sec. 158(f), allows an employer in the construction industry to enter into a collective bargaining agreement before the union achieves majority status. Todd held that such "prehire" agreements may be repudiated by an employer until the union attains majority support, but until repudiated, a prehire agreement is fully enforceable. Id. 103 S.Ct. at 1759. Todd, however, does not suggest that a binding collective bargaining agreement results where an employer relies on representations of an agent of the union and unknowingly signs a prehire agreement. Congress intended prehire agreements to be arrived at voluntarily and therefore such agreements are voidable until the union attains majority status. Id. at 1758. In holding that such agreements are enforceable until repudiated, the Court in Todd noted that it would be illogical and inequitable to allow an employer to accept the benefits of a prehire agreement and then avoid paying the bargained for consideration. Id. 103 S.Ct. at 1759
 These concerns obviously do not apply where an employer unknowingly signs a prehire agreement and neither he nor the union subsequently relies on the document as establishing a collective bargaining agreement. Similarly, holding that a binding agreement results in these circumstances would conflict with the voluntary nature of such agreements. It would be illogical to assert that an employer is free to repudiate an agreement that he does not know exists.
 
 
 [2]
 The district court expressly found that Watson did not deliver copies of the short-form agreement or the master labor agreement to Gilliam during the visit to the union office in May 1977. Although the union later mailed copies of these documents to Gilliam, he did not knowingly receive copies until the Trust Funds brought the claim for benefit contributions
 
 
 [3]
 The district court correctly considered the factors outlined in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir.1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), in determining the amount of the fee award. See Russell, 726 F.2d at 1415 n. 9. Moreover, because the district court acknowledged its hesitancy to assess fees against the Trust Funds, it is unnecessary for the court to reconsider its fee award in light of Russell