McNALLY PITTSBURG, INC.,
Plaintiff-Appellee,
Cross-Appellant,

v.

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL & ORNAMENTAL IRON WORKERS, AFL–CIO; United Brotherhood of Carpenters, Joiners of America, AFL–CIO, Defendants-Cross Claimants-Appellants, Cross-Appellees,

Iron Workers Union, 27; Millwrights Local 722; Carpenters, Local 1498, Defendants-Appellants, Cross-Appellees.

Nos. 84–2672, 84–2758.

United States Court of Appeals, Tenth Circuit.

Feb. 23, 1987.

Sandra Benson (Victor J. Van Bourg also of Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal.; and Stephen W. Cook of Stephen W. Cook & Associates, P.C., Midvale, Utah, on the briefs) for defendants-appellants-cross-appellees.

Homer L. Deakins, Jr., of Ogletree, Deakins, Nash, Smoak and Stewart, Atlanta, Ga. (Michael J. Bartlett of Ogletree, Deakins, Nash, Smoak and Stewart, Washington, D.C.; and Brian W. Steffensen of Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah. on the briefs) for plaintiff-appellee-cross-appellant.

Before BARRETT and TACHA, Circuit Judges and BOHANON, District Judge.[*]

This is an appeal from a judgment of the United States District Court for the district of Utah declaring that the defendants, various international and local labor organizations, have no enforceable rights against the plaintiff, McNally Pittsburg, Inc., under a Memorandum of Understanding executed by the parties. In affirming the decision reached by the District Court, we need only address three of the contentions raised by the parties:[1] (1) whether the court had subject-matter jurisdiction under Section 301 of the Labor Management Relations Act to rule on the issues presented; (2) whether the court acted correctly in ruling on the existence of a contract before ordering arbitration pursuant to that contract; and (3) whether the court's determination that no contract existed between the parties was supported by the evidence and the law.

## BACKGROUND

McNally Pittsburg, Inc. (McNally), a general contractor in the construction industry, was awarded a prime contract in 1982 to build coal processing equipment for the Intermountain Power Agency, a political subdivision of the State of Utah, at the Intermountain Power Project (IPP) in Delta, Utah. The defendants are building trade unions (Unions) whose members are working at IPP.

In late 1981 and early 1982, the Unions and the project construction manager, Bechtel Power Corporation (Bechtel), negotiated two agreements governing the work to be conducted at IPP. The first document, the Stabilization Agreement, established all general working conditions at IPP, including wages, benefits, hours and overtime. All contractors were required to sign the Stabilization Agreement in order to "maintain harmonious relations between all parties to the agreement, to secure optimum productivity, and to eliminate strikes, lockouts, or delays in work." The Agreement also provided that it was not "intended to influence labor policies of any employer" who signed it.

The second negotiated document, the Memorandum of Understanding (Memorandum), was a pre-hire agreement which established referral procedures for hiring employees through the various signatory unions. The Memorandum also addressed jurisdictional disputes and arbitration procedures. Only those contractors intending to operate on a union basis were obligated to sign the Memorandum.

On May 17, and May 18, 1983, approximately two months before McNally was to commence work, McNally representatives met with Ron Weatherred, Bechtel's Area Labor Relations Supervisor. At these

---

[*] The Honorable Luther Bohanon, Senior United States District Judge, Western, Northern and Eastern Districts of Oklahoma, sitting by designation.

[1.] We need not reach the issues raised in McNally's cross-appeal: (1) whether repudiation of a pre-hire agreement is to be resolved by the court or an arbitrator, or (2) whether McNally repudiated the pre-hire agreement.

meetings, Neal Jerome, McNally's Project Supervisor at IPP, and John Jeter, McNally's Industrial Relations Manager, advised Weatherred that McNally would operate on an open-shop, non-union basis. A few days later, Bechtel mailed copies of both the Stabilization Agreement and the Memorandum to Gary Skidmore, McNally's Project Engineer.

On May 31, 1983, Skidmore took these documents to John Jeter's office and told Jeter, "These are the Stabilization Agreements for IPP, and they've got to be signed and out today." Jeter, who was hurriedly preparing to catch a plane, instructed Skidmore to leave the papers on the corner of his desk. Jeter was immediately called to his boss' office for a 45 minute meeting. At the conclusion of the meeting, Jeter quickly returned to his office, grabbed his briefcase and rushed toward the door. He then realized that he had forgotten to sign the papers delivered by Skidmore. Jeter returned to his office, flipped to the signature pages and signed the documents. Jeter dropped the documents on his secretary's desk and told her to mail them out.

When Bechtel received the signed Stabilization Agreement and Memorandum from Jeter, Weatherred mailed a copy of the Memorandum to the Unions' representatives. Jeter first became aware that he had signed the Memorandum on June 14, 1983, when the Unions requested a pre-job conference with McNally. He sent telegrams to the Union's representatives the same day advising them that his signing of the Memorandum was inadvertent. The telegrams stated that McNally had no intention of being bound by the Memorandum. The Unions responded by telegram, also on June 14, that they intended to hold McNally to the signed Memorandum.

McNally has neither sought nor accepted benefits under the Memorandum. Rather, since June 14, 1983, McNally consistently represented that Jeter inadvertently signed the Memorandum and that McNally does not intend to honor the agreement. Other than requesting the pre-job conference, the Unions have not acted in reliance upon the Memorandum.

McNally filed this case seeking a declaration that the Unions have no enforceable rights arising from McNally's inadvertent signing of the Memorandum. The trial court found that McNally never entered into the contract because the Memorandum was signed unintentionally. Moreover, the trial court concluded that the inadvertent signing of the Memorandum made it inequitable, under all the circumstances, to enforce the agreement. The court rendered judgment for the appellee declaring that the Unions have no enforceable rights against McNally under the Memorandum of Understanding.

## I.

We first consider whether the trial court had jurisdiction under Section 301[2] to consider a complaint which addresses only the validity and not a violation of a collective bargaining agreement.

Relying on decisions rendered by the First, Third, Seventh and Ninth Circuits, the Unions maintain that the trial court lacked subject-matter jurisdiction to decide whether the Memorandum was a valid contract. It is now beyond dispute, the appellants argue, that federal jurisdiction does not arise unless an allegation exists that a collective bargaining agreement has been breached. The Unions urge this court to vacate the declaratory relief granted by the trial court because McNally sought only a determination of the Memorandum's legitimacy and not a remedy for an alleged violation.

Three circuit courts interpret § 301 narrowly and literally. In *NDK Corporation v. Local 1550 of the United Food & Commercial Workers International Union,* 709 F.2d 491 (7th Cir.1983), the NDK Cor-

---

2. The pertinent language of Section 301 of the Labor Management Relations Act (29 U.S.C. § 185) states:

   Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties....

poration sought rescission of a collective bargaining agreement and a stay of arbitration proceedings. In affirming the district court's dismissal for lack of jurisdiction under § 301, the Seventh Circuit held that "the plain language of § 301 ... provides jurisdiction for suits for violation of contracts but not for determinations of the validity of contracts where validity is the ultimate issue." *Id.* at 493.

The court in *NDK* emphasized that a similar interpretation of § 301 had been adopted by the First Circuit in *Hernandez v. National Packing Co.*, 455 F.2d 1252 (1st Cir.1972). Hernandez and other employees of the packing company filed suit to have a collective bargaining agreement between the company and the Seafarers International Union declared null and void. The employees challenged the contract's legality by arguing that the Union no longer represented the interests of the majority in the bargaining unit. Pointing to the statutory language, the First Circuit ruled that § 301, in the absence of other jurisdictional claims, does not confer jurisdiction upon federal courts to determine the validity of a contract. *Id.* at 1253.

The Third Circuit has also held that § 301 only authorizes jurisdiction over suits for a violation or breach of a contract. *Leskiw v. Local 1470, International Brotherhood of Electrical Workers*, 464 F.2d 721 (3rd Cir.1972); *Adams v. Budd Co.*, 349 F.2d 368 (3rd Cir.1965). The plaintiffs in *Adams* alleged that the union and company had negotiated a contract which abrogated the employees' vested seniority rights. The court found no jurisdiction under § 301 to consider whether a collective bargaining agreement was itself a violation of pre-existing rights. *Adams*, 349 F.2d at 369–70. The plaintiffs in *Leskiw* attempted to invalidate a contract which they believed arbitrarily cut the wages of some employees. Relying on their previous opinion in *Adams*, the Third Circuit reiterated that § 301 applies only to cases which involve an alleged breach of a contract. *Leskiw*, 464 F.2d at 723.

While the Ninth Circuit has also employed language suggesting that an alleged violation is a prerequisite to § 301 jurisdiction, that Circuit's philosophical approach to § 301 is strikingly different. The Ninth Circuit maintains that § 301 is not to be read narrowly. *Alvares v. Erickson*, 514 F.2d 156, 162 (9th Cir.1975).

In determining that a labor dispute is not a prerequisite to jurisdiction, the court in *Painting & Decorating Contractors Assoc. v. Painters & Decorators Joint Comm.*, 717 F.2d 1293, (9th Cir.1983), reviewed the purposes of § 301. Relying on recent Supreme Court decisions, the court found that § 301 fosters two objectives: (1) the promotion of industrial peace by allowing federal courts to consider collective bargaining agreements, and (2) the development of a consistent body of labor law by allowing federal courts to interpret contract terms. *Id.* at 1295. Within the Ninth Circuit, "These important purposes have consistently justified a broad interpretation of § 301(2)." *Id.*

A broad interpretation of § 301 has been adopted by other courts as well. We cannot accept the Union's assertion that the requirement of an alleged violation under § 301 is beyond dispute. Decisions rendered in the Fifth and Eleventh Circuits are in clear disagreement with the Circuit decisions cited by the Unions.

The rule of law in the Eleventh Circuit is that "a district court has jurisdiction under Section 301 to make a determination as to whether a collective bargaining agreement in fact exists." *Board of Trustees v. Universal Enterprises, Inc.*, 751 F.2d 1177, 1184 (11th Cir.1985). The Eleventh Circuit based its broad view of § 301 jurisdiction upon the reasoning of the Fifth Circuit in *United Steelworkers v. Rome Industries, Inc.*, 437 F.2d 881 (5th Cir.1970).

The circumstances giving rise to *United Steelworkers* are similar to those in the present case; a union wanted to enforce an alleged collective bargaining agreement which had not been reduced to writing and executed by the parties. Unlike the trial court below, however, the district court in *United Steelworkers* concluded that the employer's failure to sign was not a suffi-

cient allegation of breach to satisfy the alleged violation language of § 301.

Although the Fifth Circuit affirmed the trial court's dismissal of the action in *United Steelworkers*, the appeals court disagreed with the district court's analysis of the case. The Fifth Circuit held that the trial court had authority under § 301 to decide whether a contract did exist. *Id.* at 882. Moreover, the court reiterated that a party need not allege a violation in order to seek a declaration of rights under a contract. *Id.* at 883. When a union had earlier attempted to invalidate a restrictive subcontracting clause through a declaratory judgment, the Fifth Circuit determined that declaratory relief was included among the remedies authorized by § 301. *El Paso Bldg. & Constr. Trades Council v. El Paso Chapter Assoc. Gen. Contractors*, 376 F.2d 797, 800 (5th Cir.1967).

We find the reasoning of the Fifth and Eleventh Circuit cases to be more persuasive than those decisions in which language of § 301 is given a restrictive meaning. The United States Supreme Court has ruled that § 301 is not to be given a narrow reading. *Smith v. Evening News Assn.*, 371 U.S. 195, 199, 83 S.Ct. 267, 269, 9 L.Ed.2d 246 (1962). The legislative history of the statute, set out in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957), reveals that Congress:

> contemplates not only the ordinary lawsuits for damages but also such other remedial proceedings, both legal and equitable, as might be appropriate in the circumstances; in other words, proceedings could, for example, be brought by employers ... in order to secure declarations from the Court of legal rights under the contract.

The dual purposes of § 301, to promote industrial peace and develop uniform law, demand that the statute be construed broadly. We therefore adopt the position that an action for a declaratory judgment is sufficient to confer jurisdiction upon a federal court under § 301.

## II.

We next address whether the trial court, when faced with evidence that no contract had been intentionally executed by the employer, properly ruled on the contract's existence before enforcing the arbitration clause of the agreement. The Unions argue that the doctrine of severability [3] announced in *Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) prohibited the trial court from deciding this case on the merits. Because McNally's claim of invalidity goes to the contract as a whole, the Unions assert, the claim is one for an arbitrator to decide.

This court is well aware of the national policy favoring arbitration of labor disputes. *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The labor arbitrator does play a uniquely important role in resolving industrial disputes; however, the courts perform the duty of deciding whether parties agreed to utilize an arbitrator's skills. *Warrior and Gulf*, 363 U.S. at 582, 80 S.Ct. at 1352.

By enacting § 301 of the Labor Management Relations Act, Congress designated the courts as the appropriate forum for determining whether a party has breached a promise to arbitrate. *Id.* "[W]hether or not [a] company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962).

---

**3.** The severability doctrine holds that an arbitration clause is "seperable" from the contract in which it is contained. In *Prima Paint,* the Court ruled that a claim of fraud aimed only at the arbitration clause is one for the federal courts to address; however, a broad arbitration clause will demand arbitration of a claim that the entire contract was procured by fraud. *Prima Paint,* 388 U.S. at 402, 87 S.Ct. at 1805.

An obvious prerequisite to finding that a litigant has breached a promise to arbitrate is ascertaining whether a promise was given or a contract was made. Because the duty to arbitrate arises, if at all, from a contract, a court cannot compel arbitration without first confirming that a collective bargaining agreement containing such a duty does in fact exist. *John Wiley & Sons v. Livingston,* 376 U.S. 543, 547, 84 S.Ct. 909, 912, 11 L.Ed.2d 898 (1964).

In *Wiley,* the employer acquired by merger a company which was bound by a collective bargaining agreement. The union sued to compel arbitration when Wiley refused to recognize the union as a bargaining agent. Wiley claimed that the merger terminated the labor agreement. *Id.* at 544–45, 84 S.Ct. at 911–12. Relying on *Atkinson* and *Warrior & Gulf,* the Court held that whether the contract survived the merger was undoubtedly a question for the courts. *Id.* at 546–47, 84 S.Ct. at 912–13.

We are not persuaded that the severability doctrine adopted in *Prima Paint* should be interpreted as negating the Court's rulings in *Atkinson, Warrior & Gulf* and *Wiley. Prima Paint* dealt with the construction of the United States Arbitration Act in a commercial context, not the application of the Labor Management Relations Act in an industrial context. Arbitration is viewed differently in a labor context than in a commercial setting. *Warrior & Gulf,* 363 U.S. at 578, 80 S.Ct. at 1350. The commercial severability doctrine of *Prima Paint* in no way abolishes a court's duty under § 301 to determine whether the parties to a labor contract agreed to submit issues to arbitration. As the Supreme Court stated some six years after the *Prima Paint* decision: "No obligation to arbitrate a labor dispute arises solely by operation of law. The law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Gateway*

Coal Co. v. United Mine Workers, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974).

In *Prima Paint,* as well as the other cases cited by the Unions, the parties had undisputably entered into a contract containing an arbitration clause. The issue in those cases centered on the enforceability or validity of a pre-existing contract.[4] The trial court in this case did not attempt to construe the enforceability of the Memorandum. Rather, the court inquired as to the existence of the contract and determined that no agreement was ever entered into by McNally. Even under the *Prima Paint* construction of the Arbitration Act, a claim that no contractual relation existed between the parties must be resolved before the court can order arbitration. *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 462 F.2d 673, 676 (2nd Cir.1972).

Under § 301, the district court correctly ruled on the existence of an agreement before ordering the parties to proceed to arbitration.

### III.

After establishing that the trial judge properly reached the question of whether the Memorandum had been entered into by McNally, we now address whether the court's decision on that issue was supported by the evidence. In reviewing the lower court's findings, we must view the evidence in the light most favorable to the prevailing party and give McNally the benefit of any reasonable inferences to be drawn from the evidence. *Hart v. Western Investment and Development Co.,* 417 F.2d 1296, 1300 (10th Cir.1969). The trial court's findings will not be set aside unless they are clearly erroneous. *Id.*

■ Under normal circumstances, ignorance of the contents of a document will not release a signer from liability. *E.F.*

---

4. In *Prima Paint,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), a buyer challenged a contract, which had been in existence for a full year, as unenforceable due to fraudulent misrepresentations as to the seller's solvency. Other severability cases cited by the Unions dealt with the rescission, modification, repudiation, termination, or cancellation of admitted contracts. These opinions presume the existence of a contract and concern subsequent challenges to the contract's enforceability.

*Hutton & Co., Inc. v. Shank,* 456 F.Supp. 507, 511 (D.Utah 1976). Yet, this general rule "is qualified by the principle that he who signs a document reasonably believing it is something quite different than it is cannot be bound to the terms of the document." *Operating Engineers Pension Trust v. Gilliam,* 737 F.2d 1501, 1504 (9th Cir.1984). In *Gilliam* a union member signed a trust agreement which was included in a group of forms he believed pertained only to membership. Holding that no contract had ever been formed because there was no mutual assent, the court refused to enforce the trust fund agreement. *Id.* at 1503–04.

██ The record supports the trial court's finding that the Memo was never entered into by McNally because there was no mutual assent. The evidence confirms that Jeter was not expecting Bechtel to send copies of the Memo because McNally had clearly indicated its intention to proceed on a non-union basis. The record shows that Jeter signed the documents, which his Project Engineer identified as the Stabilization Agreements, while he was hurriedly preparing to leave town on a business trip. His familiarity with the Stabilization Agreement made it reasonable for him to sign the documents without re-reading them. His assumption that Bechtel would want several copies for the multiple parties involved was also reasonable. Most importantly, an examination of the Stabilization Agreement and the Memorandum reveals that the signature pages were virtually identical.

The facts before us support the trial court's findings that McNally never intended to sign the Memorandum. Jeter's belief that he was signing only the Stabilization Agreement was reasonable. As in *Gilliam,* the trial judge correctly interpreted these circumstances to be an exception to the general rule that a party's signature is binding.[5]

The judgment of the district court is affirmed.

---

**5.** Because we affirm the court's conclusion that no contract ever existed, we need not consider the equities of enforcing the Memo in this case.