875 F.2d 861
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
BOARDS OF TRUSTEES FOR the MICHIGAN CARPENTERS HEALTH &
WELFARE FUND, Michigan Carpenters Council Pension
Fund, and Michigan Carpenters Council
Apprenticeship & Training
Fund, Plaintiffs-Appellants,
v.
BURTON ALUMINUM PRODUCTS, INC., a Michigan Corporation,
Defendant-Appellee.
 Nos. 88-1625, 88-1664.
 United States Court of Appeals, Sixth Circuit.
 May 8, 1989.
 
 Before MERRITT and DAVID A. NELSON, Circuit Judges, and LIVELY, Senior Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This case, which involves an employer's liability for contributions to certain multiemployer benefit plans, comes before us on appeal and cross-appeal from a district court judgment that was largely favorable to the employer. Finding ourselves in some doubt as to the grounds on which the district court's decision rested, we shall vacate the judgment and remand the case for further findings.
 
 
 2
 * Defendant Burton Aluminum Products, of Grand Rapids, Michigan, is in the business of selling and installing aluminum windows, siding, and doors. The company's activities are centered in the western part of Michigan. Its employees have not, historically, been unionized.
 
 
 3
 In 1980 the company entered into a subcontract for the installation of aluminum siding at a housing project at Bay City, Michigan, in the eastern part of the state. Burton assigned a crew of three men to the job. A business agent for Local Union 1161 of the Saginaw Valley District Council of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, apparently gave Burton to understand that there would be picketing and a work stoppage if the three men were not enrolled in the union. Burton was agreeable to putting the three men in the union and paying their initiation fees and dues for the two months they were expected to remain on the Bay City job, and Donald Kalawart, a vice-president of the company, subsequently testified that he signed the paperwork presented by the union without reading it and without being given copies of what he signed. Mr. Kalawart was told, he said, that the papers included contracts covering fringe benefits for the three men. He expected to receive a bill for the fringe benefit payments, he testified, but no such bill was forthcoming.
 
 
 4
 Some months later the same three Burton employees and a foreman named Joe Hamilton were installing siding at a jobsite in Owosso, Michigan, when a representative of another local union in the Saginaw Valley District Council allegedly forced Mr. Hamilton off the job because he was not a member of the union. Burton's president, James DeVries, then gave the union a check to cover the initiation fees and dues of Mr. Hamilton, and Burton subsequently paid the union dues of the other three men. Six more employees were eventually enrolled in the union during the course of the Owosso job and a job in nearby Swartz Creek, as we understand it, but the majority of the company's 25 or 26 installers never became union members.
 
 
 5
 When Mr. DeVries contacted the union about Mr. Hamilton, DeVries testified, he was asked to sign a contract that he was told would cover only men working on the Owosso project, and would cover them only for the time they were on that project. On this understanding, according to Mr. DeVries, he signed a contract tendered by the union without reading it.
 
 
 6
 It subsequently developed that the papers Messrs. Kalawart and DeVries had signed included
 
 
 7
 --An "Employer Registration" form purporting to commit Burton to make contributions to designated "Fringe Benefit Funds" of the Michigan Carpenters Council "on all employees employed by [Burton] who are working in the carpentry trade" (Plaintiffs' Exhibit 1);
 
 
 8
 --A "Consent Agreement" purporting to commit Burton to be bound by all of the terms and conditions of certain collective bargaining agreements covering carpenter work in the jurisdiction of the Saginaw Valley Carpenters District Council, as well as "the most current collective bargaining agreements of any other carpenters district council within the State of Michigan as shall be in effect in any area where [Burton] shall engage in any phase of carpenter work" (Plaintiffs' Exhibit 2);
 
 
 9
 --A "Michigan Statewide Residential Agreement" purporting, among other things, to recognize Local Union 1161 as the exclusive bargaining representative for all carpenters engaged in residential construction throughout the State of Michigan, except for the greater Detroit area (Plaintiffs' Exhibit 3); and
 
 
 10
 --A contract purporting to commit Burton to be bound by all of the terms and conditions of a certain collective bargaining agreement between the Saginaw Valley Carpenters District Council and the Michigan Chapter of the Associated General Contractors of America covering all or part of 16 named counties in eastern Michigan (Plaintiffs' Exhibit 4). (This contract did not extend to Kent County or Ottowa County, where Kalawart testified the company did the majority of its work; we do not know whether Burton had any jobs in the Saginaw Valley area other than the three mentioned above.)
 
 
 11
 The plaintiffs in the instant case are the boards of trustees of three of the four multiemployer benefit funds named in Plaintiffs' Exhibit 1, the "Employer Registration" form. Alleging that Burton had obligated itself to remit contributions to the plaintiffs on behalf of Burton-employed carpenters generally, the plaintiff funds brought a federal court action against Burton under Sec. 301 of the Labor Management Relations Act of 1947, 29 U.S.C. Sec. 185, and Sec. 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1132. Burton's obligation, the plaintiffs assert, was "to remit contributions to the funds based on hours worked by [Burton's] carpenters anywhere in the state of Michigan (as opposed to hours worked on three projects only)." The plaintiffs sought an order compelling Burton to submit to an audit of its payroll records and to pay fringe benefit contributions in whatever amount was shown by the audit to be owing, plus interest, liquidated damages, and attorney fees.
 
 
 12
 Burton offered to confess judgment in the amount of $8,608.32, a figure based on fringe benefit contributions for the carpenters on the Bay City, Owosso and Swartz Creek jobs only. The offer was rejected. After an arbitration proceeding in which Burton prevailed on grounds not relevant here, the case was tried de novo in the district court. At the conclusion of the trial the court ruled from the bench that a complete audit would be had as to Burton employees at the Bay City, Owosso and Swartz Creek jobs, with Burton being ordered to pay contributions for carpenters employed on those projects and those projects only. A written opinion and order entered in May of 1988 supplemented the court's bench ruling in certain respects, awarded costs to Burton in the amount of $900.46, denied a request by Burton for attorney fees, denied a request by the plaintiff funds for double interest, and entered judgment for unpaid contributions at the three work sites in the amount of $5,970.08, plus statutory interest in the amount of $5,329.41.
 
 
 13
 The plaintiff funds perfected a timely appeal, asserting that Burton ought to have been required to make fringe benefit contributions for carpenters employed anywhere in the state of Michigan and ought to have been required to pay double interest under 29 U.S.C. Sec. 1132. Burton cross-appealed, asserting that it was entitled to an award of attorney fees under the same statutory section.
 
 II
 
 14
 In equity, we have no doubt, the unions would not be entitled to hold Burton to the literal terms of any of the documents in question, and Burton would have an equitable claim against the unions for reformation of the documents. See Hand v. Dayton-Hudson, 775 F.2d 757 (6th Cir.1985). The unions are not parties to this lawsuit, however, and the central issue presented here is whether, under the pertinent statutes, the legal rights of the plaintiff funds are subject to some or all of Burton's equitable and/or legal rights against the unions.
 
 
 15
 Normally, of course, as the district court observed in its bench ruling, "[a]ny defense which a party might have to the execution or to the terms of the contract with the union would be a defense to an enforcement by the third-party beneficiary." Under ERISA, however, it has been held that a benefit fund occupying the position of a third-party beneficiary "is like a holder in due course in commercial law"--and, as such, the third-party is "entitled to enforce the writing without regard to understandings or defenses applicable to the original parties." Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., --- F.2d ----, ---- (7th Cir.1989) (en banc).
 
 
 16
 As to some of the documents signed by Burton, we are uncertain whether the district court viewed the plaintiff funds as third-party beneficiaries only or as parties contracting directly with Burton through a union business agent. Although the court said at one point that "the Fund clearly becomes ... a third-party beneficiary of the contract that is entered into between the employer and the union," the court also said that "a correct characterization may be that the business agent, in going into the field for purposes of this union organizing activity, is an agent of the Fund for purposes of securing the signatures of the employer on the documents required to put the Fund into operation."
 
 
 17
 The "Employer Registration" form, as the plaintiff funds acknowledge, did not purport to create a contract to which the union was a party. If the union business agent who obtained Mr. Kalawart's signature on the registration form was acting as the agent of the plaintiff funds--and we note that the form was apparently prepared by the funds themselves and was furnished to the business agent by them--the knowledge of the agent would be the knowledge of the principal. And if, under those circumstances, the plaintiff funds could still insist on strict enforcement of the purported obligation to make fringe benefit contributions, it certainly would not be because the funds were in the position of a holder in due course without notice. We do not know whether the funds should be charged with notice, however, because the district court made no clear finding on the agency question.
 
 
 18
 Neither can we tell for certain whether the district court believed that the documents signed by Burton were void ab initio, in effect, or whether they imposed an obligation that was modified by the subsequent conduct of Burton and the unions. In its ruling from the bench, the court found that there was no fraud in the execution of the documents and no mutual mistake. In its subsequent memorandum opinion, however, the court found the present situation comparable to that in Operating Engineers Pension Trust v. Gilliam, 737 F.2d 1501 (9th Cir.1984), a "fraud in the factum" case where it was held that because the party sought to be charged with fringe benefit contributions under a purported collective bargaining agreement had signed the agreement under the reasonable belief that the document was something quite different, no valid collective bargaining agreement had ever existed.
 
 
 19
 In its ruling from the bench, similarly, the district court seemed to suggest that there had been a modification of an enforceable written commitment to make fringe benefit contributions on a state-wide basis:
 
 
 20
 "Was it modified? Yes it was. It was modified as to geography and it was modified as to duration...."
 
 
 21
 In its memorandum opinion, on the other hand, the court seemed to suggest that there had never been an enforceable state-wide commitment that would have been capable of modification, because Burton had not in fact undertaken to make state-wide contributions on the first place: "While the rather broad and comprehensive agreements signed between defendant and the Local Unions in 1980 and 1981 covered all defendant's employees within the state of Michigan, This Court concluded by a clear preponderance of the evidence that such was not the intention of the contracting parties." (Emphasis supplied.) (The parol evidence rule would not bar the introduction of evidence on such a question, of course; see 3 A. Corbin, Corbin on Contracts Sec. 579 (2d ed. 1960).)
 
 
 22
 If there was fraud in the execution of the documents, or something comparable to fraud in the execution, we think the district court reached the correct result in this case.[1] If there was not, however--at least if neither of the union business agents was acting as the agent of the plaintiff funds--the power of the courts to set aside the language of the documents is far more problematical. The uncertainties loom sufficiently large, in our judgment, to necessitate a remand for clarification of the district court's findings.
 
 
 23
 Without intending to preempt the district court in its fact finding function, we offer the following observations in the hope that they may be of some assistance in performance of the task the court is being asked to undertake.
 
 III
 
 24
 To the uninitiated, the course of events that led to Burton's execution of the documents in question might be difficult to distinguish from a simple protection racket. Shortly after Burton employee Joe Hamilton started work on the Owosso job, for example, he was approached by a man who told him, as Hamilton testified, that if he did not join the union he could not work:
 
 
 25
 "He asked if I was a union member and I said I was not, and he asked me to get my ass down off the ladder and pack my gear and get the hell off the job because nobody that was not union was working on that project."
 
 
 26
 Hamilton "wanted no part of the union," he testified, but Burton's president, Mr. DeVries, prevailed upon him to become a union member "only as long as that project lasted."[2] When Mr. DeVries was told that the job would be shut down because Hamilton was not a member of the union, according to the testimony, DeVries--who had never negotiated with a union before--called a representative of the union on the telephone and "agreed that we would sign in Mr. Hamilton as a member of the union, and the job would proceed as it had been going." Mr. DeVries then signed a check to Carpenters Union # 1373 in the amount of $586.60, covering union dues and fees on Mr. Hamilton, and the company subsequently gave the union a check for $293.30 to cover the dues of the other three men on the project.
 
 
 27
 There is testimony that no union official asked Mr. DeVries if he had authority to deduct union dues from the employees' pay. Unless these payments were deducted pursuant to a written assignment, however, it was a criminal offense for Burton to make the payments to the union, just as it was a criminal offense for the union to demand or accept them. 29 U.S.C. Sec. 186. (The testimony of the business agent for Local 1373 suggests that it was not uncommon for companies to pay union initiation fees and dues for their employees without making any deduction.)
 
 
 28
 A few days after he issued the $586.60 check to the union, Mr. DeVries signed a contract with Local 1373 saying that Burton agreed to become a party to a 1980 collective bargaining agreement negotiated by the Carpenters' District Council of Saginaw Valley with the Michigan Chapter of Associated General Contractors of America. (Mr. DeVries testified that Burton was not a member of the Associated General Contractors group.) The collective bargaining agreement in question--which, as noted above, covered all or part of 16 eastern counties, and not the entire state of Michigan--contained provisions calling for payment of designated contributions to the plaintiff funds for each hour worked by all employees covered by the agreement. Mr. DeVries testified that he signed the agreement without having read it and in the belief that it covered only the men working at Owosso and only for the time that they were there.
 
 
 29
 It seems clear that Mr. DeVries at least knew it was a collective bargaining agreement to which he was putting his signature. It is less clear that Mr. Kalawart, Burton's vice-president, knew even that much about the documents which he signed in 1980.
 
 
 30
 On August 21, 1980, according to Mr. Kalawart, he received a telephone call from a man who identified himself as Alan Hibberson, business agent for Local 1161. Mr. Hibberson told Mr. Kalawart, the latter testified, "that we had three people on the [Bay City] project that were not enrolled in the union, and that he wanted to have a meeting with myself to discuss that matter."
 
 
 31
 "Q. And what did he say would be the purpose of the meeting?
 
 
 32
 A. To enroll the three men on the project into the union.
 
 
 33
 Q. Had Burton ever had any employees of any union of any kind before?
 
 
 34
 A. No, we hadn't.
 
 
 35
 Q. Had you ever negotiated with an union organizer such as Mr. Hibberson before?
 
 
 36
 A. No.
 
 
 37
 Q. During your telephone conversation with Mr. Hibberson, did he say anything about wanting to enroll any other employees beyond the three at the Baytown job site?
 
 
 38
 A. No, he didn't.
 
 
 39
 Q. How long did that telephone conversation last?
 
 
 40
 A. Approximately two minutes.
 
 
 41
 Q. Was there any discussions about what happened if you refused to meet with Mr. Hibberson?
 
 
 42
 A. Yes. The discussion was that there were maybe two or three others [subcontractors] on the project who had not enrolled their people ... into the union, and that if these enrollments weren't taken care of, that there would be picketing and a work stoppage."
 
 
 43
 On August 25, 1980, Mr. Kalawart testified, Kalawart met with Hibberson in a tool shed on the site of the Bay City project and was given three packets containing enrollment materials for each of the three employees. Mr. Kalawart agreed to enroll the three men in the union--stressing, he testified, that they were to be the only three. Because the job was expected to last only two months, Kalawart told the district court, Mr. Hibberson said "that he would give me a deal on the initiation fees. Instead of $225 apiece, he would charge me $35 apiece ..." With dues of $20 per man per month, according to Mr. Kalawart, the total price came to $225. A Burton check for that amount, signed by Mr. Kalawart and made payable to Carpenters Local 1161, was received in evidence. Whether any of the three Burton employees ever executed a written assignment authorizing payroll deductions for union dues is not disclosed in the record.
 
 
 44
 Toward the end of the conversation about enrolling the three men in the union, Mr. Kalawart testified, Mr. Hibberson mentioned that "[i]ncidentally, I have a contract or two here to take care of the fringe benefits of those three men." The "contract or two" to take care of the three men's fringe benefits were the documents described at the outset of this opinion as Plaintiffs Exhibits 1, 2 and 3. After being shown an attachment to Exhibit 3 setting the cost of the fringe benefit contributions at less than $2 per man per hour, Mr. Kalawart testified, he signed the documents without reading them. Mr. Hibberson took the papers away without giving Mr. Kalawart copies. When asked on cross examination if it did not strike him as "curious" that he was being asked to sign three different agreements, Mr. Kalawart replied as follows:
 
 
 45
 "At that time I had no reason to believe that I was not putting just the three men into the--enrolling them into the union and paying fringe benefits on those three men."
 
 
 46
 The district court did not have the benefit of Mr. Hibberson's version of what happened, subsequent attempts to locate Mr. Hibberson having proved unsuccessful. If Mr. Kalawart's account is to be believed--and this is a question, obviously, for the district court--it appears that Mr. Kalawart signed a set of documents fundamentally different from what he thought he was signing. Enrollment of an individual as a member of a union is not to be equated with the employer's recognition of the union as a collective bargaining representative, and a contract to pay specified fringe benefits for designated individuals or employees on a designated construction project would seem to bear little resemblance to a conventional collective bargaining agreement setting wages, hours and conditions of employment for everyone in a bargaining unit. If Mr. Burton was induced to sign the documents in the context of a pattern of disregard for the statutory norms of collective bargaining, moreover, that might lend support to a conclusion that the union was not too particular about its characterization of the documents, just as Burton was not too particular about what it was signing.
 
 
 47
 Once Local 1161 had pocketed Burton's $225, Mr. Kalawart said he had no further contact with Mr. Hibberson or anyone else from Local 1161. Burton apparently made no attempt to comply with the terms of any collective bargaining agreement, and it was not asked to do so. The union never designated a steward on any of Burton's projects, never represented a Burton employee in grievance proceedings, and, as far as we know, never did anything else suggesting that it considered itself the representative of Burton's carpenter employees under the "Michigan Statewide Residential Agreement" or any other collective bargaining agreement. After Mr. DeVries had signed the Saginaw Valley agreement (Plaintiffs' Exhibit 4) and arranged for the payment of union fees and dues to Local 1373, similarly, Mr. DeVries testified that he knew of no further contact between Burton and that union. If Burton was in fact bound by collective bargaining agreements covering the entire state of Michigan, one would be hard put to tell it from the conduct of the unions after the documents had been executed.
 
 
 48
 As to Plaintiffs Exhibit 1, the "Employer Registration" form for the Michigan Carpenters Council Fringe Benefit Funds, both the text of the form and the testimony of Brenda Beach, an employee of the administrator of the funds, indicate that execution of the form does not make an employer a party to a collective bargaining agreement. An employer need not be a signatory to a collective bargaining agreement to contribute to the funds as long as there is an Employer Registration on file, Ms. Beach testified, and the obligation to make contributions to the benefit funds may arise solely from the filing of a registration form.
 
 
 49
 The registration form was drafted by a fund attorney, Ms. Beach testified, and copies of the form were furnished to employers solely by union business agents. The business agents were supplied with the forms by the administrator of the funds. We think it would be within the province of the district court to find that Mr. Hibberson was acting on behalf of the funds, as well as on behalf of Local 1161. The potential significance of such a finding, along with that of other possible factual determinations, will be considered in the section that follows.
 
 IV
 
 50
 Section 402(a)(1) of ERISA provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. Sec. 1102(a)(1). Section 302(c)(5)(B) of the Labor Management Relations Act, similarly, requires a "written agreement" specifying the "detailed basis" on which any payments are to be made by the employer to a trust fund such as the ones involved here. 29 U.S.C. Sec. 186(c)(5)(B). The terms of written employee benefit plans may not be modified by oral agreement, see Musto v. American General Corp., 861 F.2d 897, 910 (6th Cir.1988), and the cases there cited, and the same principle, we believe, is applicable to written instruments by which an employer adheres to such plans.
 
 
 51
 We are strengthened in this conclusion by the text of Sec. 515 of ERISA, 29 U.S.C. Sec. 1145, which reads as follows:
 
 
 52
 "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."
 
 
 53
 In Gerber Truck Service, Inc., --- F.2d --- (7th Cir.1989), supra, where a multiemployer pension fund sued to enforce written funding commitments contained in a collective bargaining agreement executed by an employer and local union, this provision was interpreted as cutting off "[d]efenses based on fraud on the inducement, oral side agreement, course of performance, want of consideration, [and] failure of the union to have majority support." Id. at ----.[3] Without necessarily endorsing every word of the Seventh Circuit opinion, we are bound to say that the core principle of the decision strikes us as sound.
 
 
 54
 It does not necessarily follow, however, that Gerber Truck Service will control the result in the case at bar. The defendant in Gerber knowingly signed documents promising to make contributions on behalf of all bargaining unit employees, and "he knew when he signed that he did not plan to live up to his commitment." Id. at 14. In the present case, by contrast, it would be open to the district court to find that Burton's "commitment" was one of which Burton had no knowledge at all--and if there was fraud in the execution of the documents, as opposed to fraud in the inducement for signing them, the caselaw makes it clear that the defense can be asserted against the plaintiff funds even if the fraud is no way attributable to them. See Operating Engineers Pension Trust v. Gilliam, 737 F.2d 1501, supra (recognizing fraud in the factum as a defense); Southern California Retail Clerks Union and Food Employers Joint Pension Trust Fund v. Bjorklund, 728 F.2d 1262 (9th Cir.1984) (rejecting fraud in the inducement as a defense); Southwest Administrators, Inc. v. Rozay's Transfer, 791 F.2d 769 (9th Cir.1986) (explaining the distinction between the two).
 
 
 55
 If either union business agent was wearing two hats when he procured Burton's signature, moreover--if he was acting both on behalf of the union and on behalf of the plaintiff funds--the distinction between fraud in the execution and fraud in the inducement may be immaterial as far as that agent's conduct is concerned. We are aware of no case in which 29 U.S.C. Sec. 1145 has been held to enable a benefit fund to collect contributions from an employer whose promise to make such contributions was fraudulently induced by the fund's own representatives. We shall not decide the question here, but it is far from obvious to us at this point that it would "not [be] inconsistent with law," within the meaning of 29 U.S.C. Sec. 1145, to let the plaintiff funds compel the employer to make contributions in accordance with the terms of a plan or agreement to which the employer was induced to subscribe by the plaintiffs' own fraud.
 
 
 56
 We note, finally, that the facts of this case might conceivably lead the district court to conclude that the plaintiff funds are entitled to enforce the fringe benefit provisions of the Saginaw Valley agreement, Plaintiffs' Exhibit 4, but not the provisions of the three documents signed earlier. Whether this would make any practical difference, of course, we do not know.
 
 
 57
 For the reasons stated, the judgment of the district court is VACATED, and the case is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 58
 MERRITT, Circuit Judge, concurring.
 
 
 59
 I concur in Judge Nelson's careful opinion remanding the case for further factfinding and analysis on the fraud, agency and contract issues.
 
 
 60
 There also seems to be another issue latent in the case and worthy of factfinding and analysis in the District Court. What has happened here does not have a good odor. Judge Nelson's use of the figurative phrase "protection racket" seems not inappropriate. The union and the fund seem to be simply collecting money from the defendant by improper coercive tactics which good labor management policy should not permit. If upon remand the facts demonstrate that the union representative was simply engaged in a form of coercion not connected with any legitimate labor management theory or policy, the District Court should consider whether the contracts in question which the union representative insisted upon as the price of labor peace are void as against public policy and are therefore unenforceable.
 
 
 
 [1]
 Under this hypothesis, we would have no problem with the district court's disposition of the interest and attorney fee questions
 
 
 [2]
 Under Sec. 8(e) of the Labor Management Relations Act, 29 U.S.C. Sec. 158(e), it would not have been an unfair labor practice for the general contractor on the Owosso job to sign a collective bargaining agreement promising not to deal with sub-contractors who had not agreed to abide by the terms of the agreement, including any union shop terms. See Jim McNeff Inc. v. Todd, 461 U.S. 260, 270 n. 9 (1983). Under Sec. 8(f) of the Act, moreover, it would not have been an unfair labor practice for Burton to sign a "prehire" collective bargaining agreement with a union the majority status of which had not been established. The purpose of Sec. 8(f) was "to permit voluntary prehire agreements," however; the statutory provision was not intended, according to one distinguished observer, "to authorize a labor organization to strike, picket, or otherwise coerce an employer to sign a prehire agreement where the majority status of the union had not been established." 104 Cong.Rec. 11,308 (1958) (remarks of Senator John F. Kennedy). And be that as it may, we are aware of nothing in the Labor Management Relations Act that was intended to permit employers or unions to coerce employees into becoming union members in the way Mr. Hamilton seems to have been coerced
 
 
 [3]
 Burton argues in its appellate brief that if it in fact entered into valid prehire collective bargaining agreements, it could and did repudiate the agreements before the union achieved the support of a majority of the employees. As Gerber Truck Service demonstrates very convincingly, however, 29 U.S.C. Sec. 1145 renders any such repudiation ineffective as far as the duty to make multiemployer benefit plan contributions is concerned